UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11785-GAO

ROSE DIAZ CORDES, as Executrix and Personal Representative
of Robert C. Cordes, and R. ZACHARY CORDES,
Plaintiffs,

v.

M/V BALDOCK, her engines, tackle, equipment, apparent and appurtenances, ect., *in rem;*
and FB SHIPPING (II), INC., *in personam,*
Defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT
March 29, 2013

O'TOOLE, D.J.

The plaintiffs brought suit against the defendants for damages arising from the death of Captain Robert C. Cordes while boarding the M/V Baldock on October 24, 2006. The plaintiffs asserted claims of negligence (Count I), unseaworthiness (Count II) and wrongful death under Mass. Gen. Laws ch. 229 § 2 (Count III). The Court conducted a six day bench trial. After trial, the parties each submitted proposed findings of fact and conclusions of law. Having considered the evidence and arguments of the parties, the Court now finds and concludes as follows.

**I.     Findings of Fact**

The parties vigorously dispute whether the defendants should be held liable or not for the death of Captain Cordes, but there is really little dispute as to the facts regarding how his death occurred.

At the time of the accident, Captain Cordes was 60 years old and had served as a Boston Harbor Pilot for 40 years. Over that time, he had guided innumerable vessels generally similar to the Baldock in and out of Boston Harbor and to and from their berths.

One of the ways a pilot boards a vessel like the Baldock is by means of a Jacob's ladder, which is a rope ladder with mostly wooden treads that is extended over the rail of the vessel to be boarded to the place below where the person intending to board is located. The climb is vertical, and a degree of physical fitness is required to ascend to a vessel by a Jacob's ladder. It is a licensing requirement for pilots to be physically fit enough to climb such ladders. Pilots commonly climb Jacob's ladders in the course of their duties as a regular way of boarding a ship the deck of which is significantly higher than the pilot's location.

Another method of boarding a vessel is by a "combination ladder," which combines a Jacob's ladder with an "accommodation ladder." An accommodation ladder is a gangway, much like a staircase, that is extended down from the rail of a vessel flush against the hull at approximately a 45 degree angle. Often, and perhaps usually, an accommodation ladder will not reach all the way to the place where the person boarding the ship is located, whether on the deck of a smaller vessel such as a pilot boat or tug, or the surface of a dock at which the larger vessel is berthed. In that circumstance, a Jacob's ladder descends the rest of the way from the low end of the accommodation ladder. The use of such a combination ladder does not eliminate the need to use a Jacob's ladder, but it can shorten the distance the boarder must climb on the Jacob's ladder.

As of October 24, 2006, the date of the incident, Cordes had significant adverse health problems. He was overweight to a degree that his primary care physician, Dr. Jonathan Strongin, had diagnosed him as obese. Beginning in the late 1990's, Dr. Strongin had also diagnosed and

treated Cordes for a number of other serious conditions, including obstructive sleep apnea, hypertension, Type II diabetes, atherosclerotic heart disease, arthritis and peripheral neuropathy. As early as 1999, Cordes had reported to Dr. Strongin that he had experienced shortness of breath when climbing vertical ladders. Over the course of their doctor-patient relationship, Dr. Strongin repeatedly advised Cordes to lose weight, stop smoking, drink less alcohol and monitor his blood sugar. It appears that Cordes did curb his smoking, but his diet and alcohol consumption remained problematic. Dr. Strongin continued to diagnose diabetes and hypertension.

    On the day of the incident, Cordes arrived at the facility on Chelsea Creek where the Baldock was berthed to board the vessel and pilot it out of the harbor. He requested the use of a combination or accommodation ladder to board the Baldock, but was told by a ship's mate that there was not such a ladder available on the starboard side of the vessel, which lay against the berth. Because of the size of the Baldock, the narrowness of the creek channel, and the proximity of a bridge, the vessel had to be berthed against a barge in a way that made the ship's starboard side accommodation ladder inaccessible. There was an accommodation ladder available on the port side, which could have been accessed by boat. It does not appear that either Cordes or anyone associated with the Baldock addressed that fact. Given Cordes's long service as a pilot, it is not likely that he was unaware that it would be possible to board the vessel by using the seaward accommodation ladder. There was evidence that pilots did sometimes board a berthed vessel from the seaward side rather than the shore.

    When told that the only available ladder on the shore side was the Jacob's ladder, Cordes began to climb it without any observed hesitation. The vessel did not provide a safety harness in conjunction with the Jacob's ladder that would, similar to a sling or bosun's chair, support the

user in the event of a fall. There was no applicable regulatory requirement for the vessel to do so. Another Boston pilot, Captain Deeley, testified that it was not the practice for pilots in Boston to use such safety harnesses. Cordes did not request that a safety harness be used.

Captain Deeley was to be the docking pilot for the Baldock that day, overseeing the undocking; Captain Cordes was to be the harbor pilot, guiding the vessel out of the harbor to the open sea. Deeley arrived just as Cordes began climbing the ladder and from the shore observed his ascent and fall. The Second Officer of the Baldock, Zaritsky, was on duty as Officer on Watch when the incident occurred, along with Ordinary Seaman Antolyevich. The crew members were stationed at the rail from where the Jacob's ladder was extended, and looking down, observed Cordes's fall from above. The evidence from the eyewitnesses was consistent. After climbing a way up the ladder, Cordes stopped and paused. Zaritsky asked if something happened, and Cordes replied he was just resting. Cordes started climbing again and little higher on the ladder stopped again. Zaritsky again asked how he was feeling, and Cordes replied he was fine and was just resting. Zaritsky said he heard Cordes breathing heavily, though he appeared to be holding the ladder firmly with both hands. Cordes started to climb again but then stopped about three to four feet from the deck and began to start down the ladder. Zaritsky observed "hard breathing and paleness in his face." Cordes then let go of the ladder and fell backwards to the deck of the barge to which the Baldock was moored. The fall caused fatal injuries, and Cordes died within minutes, if not immediately. The distance from the deck of the barge to the deck of the ship was 8.67 meters. Cordes climbed something less than that.

In the time that the Baldock was berthed, a number of people, including Captain Deeley, had boarded or disembarked from the vessel without incident using the Jacob's ladder. There

was no credible evidence of any physical defect either in the ladder itself or in its manner of rigging.

For the defendants, a forensic pathologist, Dr. Elizabeth Laposata, opined that the proximate cause of Cordes's fall was an ischemic event brought about by physical exertion that caused cardiac arrhythmia or dysrhythmia leading to loss of consciousness and, consequently, the fall.  She supported her opinion by reference to the observations of the eyewitnesses, the autopsy report (which showed that Cordes had an abnormally enlarged heart and severely occluded arteries), and Cordes's medical record from Dr. Strongin. I find that Dr. Laposata's opinion is soundly based and reasonable, and I credit it. I find and conclude that the precipitating cause of Cordes's fall was a cardiac event that caused him to lose consciousness and therefore fall from the ladder. I also find, consistent with that conclusion, the Cordes's fall was not caused by any physical defect in the ladder, its structure, or its manner of rigging.

**II.**     **Conclusions of Law**

A.     Cordes's Legal Status

This case involves a death that occurred within the navigable waters of the United States. For this reason, substantive admiralty law must be applied. Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1995). Admiralty law is comprised of competing statutory regimes governing injuries sustained within navigable waters. The plaintiffs assert Cordes's case falls neither under the Jones Act nor the Longshore and Harbor Worker's Compensation Act ("LHWCA") and consequently that the defendants owed him a warranty of seaworthiness pursuant to Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946). The defendants counter that Cordes was covered by the LHWCA.

*i.    Jones Act*

The Jones Act provides a remedy for "any seaman who shall suffer a personal injury in the course of his employment." 46 U.S.C. § 688(a). "Seaman" status is established by two elements. Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995). First, the employee's duties must contribute "to the function of the vessel or to the accomplishment of its mission." Id. And second, the employee must have a "connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." Id.

A harbor pilot is not a seaman under the Jones Act because he lacks the necessary connection to the vessel, in terms of duration and nature. See Bach v. Trident Shipping Co., 708 F. Supp. 772, 773 (E.D. La. 1998).

*ii.    LHWCA*

Originally enacted in 1927 to protect longshoremen and other harbor workers engaged in loading and repair work who were not eligible for state law workers compensation statutes or the protections of admiralty law, the LHWCA requires employers to compensate these workers for injuries arising out of maritime employment. 33 U.S.C. §§ 902(3), 904, 905. In 1972, the LHWCA was amended to expand coverage to "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship breaker." Id. §902(3). Excluded from the LHWCA are, among others, "a master or a member of a crew of any vessel." Id. §902(3). This expanded the test for LHWCA coverage to include a "status" test as well as a "situs" test. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 263 (1977). Thus, to be entitled to benefits, an employee must have "an injury occurring upon the navigable waters of the United States," 33 U.S.C. § 903(a) and, in some cases, also be engaged in "maritime employment" at the

time of the injury. 33 U.S.C. § 902(3). If a worker satisfies both of these conditions, he has a cause of action for negligence against a third party vessel pursuant to § 905(b).

I agree with the defendants that Cordes met the status and situs requirements of the test of LHWCA coverage and therefore has a remedy for wrongful death pursuant to §905(b). There is no question the incident in question occurred upon the navigable waters of the United States. That is sufficient in itself to bring him within the scope of the Act. Director, Office of Workers' Comp. Programs, U.S. Dep't of Labor v. Perini N. River Assocs., 459 U.S 297, 315 (1983); Harwood v. Partendereit, 944 F.2d 1187, 1191 (4th Cir. 1991). In any event, even if he were to be thought to meet the situs test only because of the expanded geographic scope enacted by the 1972 amendments to the LHWCA, he also plainly meets the companion status test. A harbor pilot's essential work is maritime in nature. Some cases regard the harbor pilot's work as *so* maritime that he should be regarded as a "master or member of the crew," and thus excluded. See Clark v. Solomon Navigation, Ltd., 631 F. Supp. 1275, 1282-83 (S.D.N.Y. 1986). I agree with the Fourth Circuit's view that a harbor pilot lacks the necessary connection to the vessel to be considered a member of the crew subject to exclusion from LHWCA coverage. Harwood, 944 F.2d at 1192.

The employment status of a harbor pilot may complicate the question of LHWCA coverage. Boston Pilots are self-employed, independent contractors. Accordingly, the employer-supplied workers compensation insurance available to employees is not available to them. See Blanq v. Hapag-Lloyd A.G., 986 F. Supp. 376, 382 (E.D. La. 1997).

However, the independent contractor status of a harbor pilot does not render him excluded from all LHWCA protection. Congress provided two separate remedies to maritime workers excluded from seaman status of the Jones Act, a cause of action against employers

pursuant to § 905(a) and a cause of action against third party vessels pursuant to § 905(b). A self-employed pilot may still have the benefit of § 905(b). See Ghotra by Ghotra v. Bandilla Shipping, Inc., 113 F.3d 1050, 1059 (9th Cir. 1997) (holding that a self employed marine surveyor was not excluded from LHWCA coverage because of his self employed status).

### iii. Sieracki Doctrine

The plaintiffs assert that decedent was a Sieracki seaman, which entitles him to a warranty of seaworthiness. Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946). However, the 1972 amendments to the LHWCA legislatively overruled Sieracki as to marine workers covered by the LHWCA. 33 U.S.C. § 905(b). See Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156, 165 (1981) (the 1972 amendments abolished the longshoreman's right to recover for unseaworthiness; the right to recover for negligence is preserved by § 905(b)). No unseaworthiness remedy is available here.

### iv. Massachusetts Wrongful Death Statute

The plaintiffs contend that they can maintain an action pursuant to the Massachusetts Wrongful Death Statute. Section 905(b) provides longshoremen with the right of recovery against a vessel owner for damages cause by negligence. "The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." 33 U.S.C. § 905(b). Thus, as Cordes is covered by § 905(b) of the LHWCA, any state law wrongful death claims are precluded. See Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 818 (2001) (LHWCA provides negligence claims for injury and death and thus preempts state law claims); Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050, 1058 (9th Cir. 1997) (person covered by the LHWCA is entitled to claims against the vessel pursuant to § 905(b), which preempts other claims); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1040-41 (5th

8

Cir. 1983) (state law negligence claim dismissed pursuant to the LHWCA); Wheelings v. Seatrade Gronigen, BV, 516 F. Supp. 2d 488, 497 (E.D. Pa. 2007) (LHWCA precludes state wrongful death remedies); and Minnick v. United States, 767 F. Supp. 115, 118 (E.D. Va. 1990) (a cause of action pursuant to the LHWCA precluded application of state wrongful death statute).

Plaintiffs argue that the § 905(b) remedy is not exclusive pursuant to Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199 (1996). The Supreme Court recognized a maritime wrongful death remedy in Moragne v. States Marine Lines, Inc., to provide for those injured in state territorial waters where state remedies were unavailable. 398 U.S. 375 (1970). The Moragne court precluded state wrongful death actions. Yamaha held that Moragne does not preempt application of the state wrongful death remedies in accident cases where Cordes is a "nonseafarer," and thus not "a seaman, longshore worker, or person otherwise engaged in the maritime trade." 516 U.S. at 202. Since Cordes is certainly considered a "seafarer" pursuant to Yamaha, the Massachusetts wrongful death remedy is not available.

B.    Liability

The plaintiffs put forth three different theories of liability by negligence: first, that the Jacob's ladder was improperly rigged; second that the vessel failed to offer a safer mode of boarding, such as a safety harness or use of the accommodation ladder to Cordes; and third, that the vessel failed to warn Cordes adequately of the danger of using the ladder. To establish negligence in violation of Section 905(b) of the LHWCA, a plaintiff must prove, by a preponderance of the evidence, both proximate causation and breach of the applicable duty of care. Keller v. United States, 38 F.3d 16, 25 (1st Cir. 1994). Under the LHWCA, vessel owners owe a duty of reasonableness under the circumstances. Scindia, 451 U.S. at 165. Since the statute

9

does not define the acts that would constitute negligence, courts apply general principles of tort law. Id.

       *i.*     *SOLAS Violation*

The plaintiffs assert that the ladder was rigged in violation of the Safety of Life at Sea treaty ("SOLAS"). A violation of a positive regulation constitutes negligence per se and triggers the application of the Pennsylvania Rule. See The Pennsylvania, 86 U.S. 125 (1873). The rule shifts the burden of proof of causation once the plaintiff has established that a vessel violated a maritime statute or regulation. Cont'l Grain Co. v. Puerto Rico Mar. Shipping Auth., 972 F.2d 426, 436 (1st Cir. 1992). However, the application of the Pennsylvania Rule is inappropriate here because the plaintiff has not demonstrated that SOLAS applied to the ladder at issue in this case.

SOLAS Regulation 23, which governs pilot transfer arrangements at sea, is codified at 46 C.F.R. § 96.40-1. The regulation specifically states "This section applies to each vessel that normally embarks or disembarks a pilot *from a pilot boat or other vessel*." 46 C.F.R. § 96.40-1 (emphasis supplied). The intention to apply these regulations at sea is further stated in subsequent sections, which set forth the technical requirements for the pilot ladders. See 46 C.F.R. § 163.003-1 ("This subpart contains standards and approval and production tests for a pilot ladder used on a merchant vessel to embark and disembark pilots and other persons *when away from the dock*") (emphasis supplied).

Given the specific regulatory language, SOLAS boarding regulations only apply to pilot transfers taking place at sea, for vessel to vessel pilot exchange. SOLAS does not cover land based pilot boarding and accessing a docked vessel. See Thompson v. Van Lines Bunkering, 2000 U.S. Dist. LEXIS 19948 (E.D. Va. June 27, 2000). Instead, Occupational Safety and Health Administration ("OSHA") regulations govern the use of the pilot ladder in this case. There is no

dispute that the vessel complied with applicable OSHA regulations. The plaintiff's own expert, Captain James Staples, confirmed that OSHA regulations were not violated by the rigging of the pilot ladder.

Since the plaintiff cannot show that the pilot ladder was rigged in violation of an applicable maritime statute, the Pennsylvania Rule is inapplicable and there is no per se negligence.

### ii. *Safety Harness*

The plaintiffs also assert that the vessel was negligent because it did not make available a safety harness for Cordes to wear while ascending the ladder. There was no evidence of any regulation or statute requiring the use of a safety harness, and Captain Deeley testified it was the general practice of Boston Harbor Pilots to climb without safety harnesses. Captain Deeley further testified that a harness can get in the way when a pilot is climbing a ladder, so he thinks it is safer climbing without the use of the harness. In these circumstances, the vessel did not breach its duty of reasonable care by not providing a safety harness to Cordes.

### iii. *Accommodation Ladder*

Finally, the plaintiff asserts that the vessel should have found a way to provide an accommodation ladder for Cordes. As noted above, it was not possible to use an accommodation ladder on the dock side of the vessel. When informed of the fact, Cordes did not hesitate or ask for an alternate way of boarding, but rather began to climb the Jacob's ladder that was available. This was not an unreasonable thing for him to do. The Jacob's ladder was a common, customary, and reasonably safe way of boarding a vessel such as the Baldock. A duty of reasonable care does not require a vessel to offer extraordinary means of access. Nor is there an obligation to

offer an alternative means of access when there is a reasonably safe means already available. The Jacob's ladder was a reasonably safe means of access.

> iv.    Failure to Warn

Any suggestion that the vessel had a duty to warn Cordes of the danger of climbing the pilot ladder is likewise without merit. A vessel does not have a duty to warn of open or obvious conditions that are known to the person or which are "so obvious and apparent" that they can be reasonably discovered. Scindia, 451 U.S. at 161. Here, the pilot ladder is certainly an open and obvious hazard. The dangers of ascending the ladder would be particularly obvious to a pilot with forty years of experience boarding ships. The vessel had two crewmembers stationed on deck at the top of the ladder and the rigging was compliant with applicable regulations. The vessel had no duty to warn Cordes about the obvious dangers of climbing the ladder.

> v.    Summary

Plaintiff has failed to establish, by preponderance of the evidence, that the vessel negligently caused Cordes's death. The evidence has shown that it is more likely than not that Cordes suffered a cardiac event, lost consciousness, and let go of the ladder, causing him to fall to his death. This is consistent with the eyewitness testimony provided by the crewmembers as well as Dr. Stongin and Dr. Laposada's testimony about Captain Cordes physical condition.

## III.   Conclusion

For the foregoing reasons, the plaintiffs' proof having failed, judgment shall enter in the defendants' favor.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge